1  WENDY J. OLSON
   UNITED STATES ATTORNEY
2  TRACI J. WHELAN
   ASSISTANT UNITED STATES ATTORNEY
3  DISTRICT OF IDAHO
   6450 MINERAL DRIVE
4  COEUR D'ALENE, ID 83815

5  LORI A. HENDRICKSON
   CHRISTOPHER P. O'DONNELL
6  TRIAL ATTORNEYS
   DEPARTMENT OF JUSTICE, TAX DIVISION
7  WASHINGTON, D.C. 20044
   TELEPHONE: (202) 514-2174

8
   Attorneys for Plaintiff
9

10              UNITED STATES DISTRICT COURT

11              FOR THE DISTRICT OF IDAHO

12  UNITED STATES OF AMERICA,      )  CASE NO. 10-0089-N-LAB
                                   )
13          Plaintiff,             )  **GOVERNMENT'S SENTENCING**
                                   )  **MEMORANDUM**
14          v.                     )
                                   )  SENTENCING HEARING:
15  MICHAEL GEORGE FITZPATRICK,    )
                                   )  Date:  MAY 13, 2013
16          Defendant.             )  Time:   9:30 a.m.
                                   )
17                                 )
                                   )
18                                 )
                                   )
19  _____    )

20          Plaintiff, United States of America, by and through its counsel of record, Trial Attorneys

21  Lori A. Hendrickson and Christopher P. O'Donnell, Department of Justice, Tax Division, hereby

22  files its Sentencing Memorandum. The government's position is based on the attached

23  memorandum of points and authorities and the record and file in this case.

24          **MEMORANDUM OF POINTS AND AUTHORITIES**

25          The government recommends that defendant Michael George Fitzpatrick be sentenced to

26  78 months in prison to be followed by a three-year term of supervised release, and that he be

27  ordered to pay restitution to the Internal Revenue Service ("IRS") in the amount of $1,397,762.

28  The government has calculated defendant's advisory United States Sentencing Guidelines

(hereinafter "Guidelines" or "U.S.S.G.") Total Offense Level to be 26. With a criminal history of category I, this results in a sentencing range of 63 to 78 months. The statutory maximum for the four counts of conviction is 144 months.

I.    **STATUS OF THE CASE**

On April 14, 2010, the indictment in this case was returned, charging defendant with four crimes:

Count 1: individual income tax evasion for calendar year 2003;

Count 2: individual income tax evasion for calendar year 2004:

Count 3: failure to file 2004 Dynamic Solutions, Inc. ("DSI") corporate income tax return;

Count 4: failure to file 2004 North American Educational Services, Inc. ("NAES") corporate income tax return. Counts one and two charged violations of 26 U.S.C. § 7201; counts three and four charged violations of 26 U.S.C. § 7203.

On September 10, 2012, trial commenced on the four counts charged, with the Honorable Edward J. Lodge presiding. The government called 29 witnesses during the five-day trial.

On September 19, 2012, the jury returned verdicts of guilty on counts three and four but was unable to reach verdicts on counts one and two. Judge Lodge set sentencing for December 3, 2012.

On October 25, 2012, Judge Lodge granted the government's Motion to Continue Sentencing with the date to be determined upon the final resolution of counts one and two.

On January 8, 2013, the re-trial of counts one and two commenced with the Honorable Larry A. Burns from the Southern District of California presiding. The government called 23 witnesses during the three-day trial.

On January 11, 2013, the jury returned verdicts of guilty on counts one and two. Defendant was remanded into custody.

On April 8, 2013, the Probation Office disclosed the Presentence Investigation Report ("PSR").

1   Sentencing for all four counts is scheduled for May 13, 2013.

2   **II.     SENTENCING CALCULATION**

3          A.     Sentencing Guidelines Calculation

4          Title 18 U.S.C. §3553(a)(4) instructs a sentencing court to consider the Guidelines

5   sentence. Title 18 U.S.C. §3553(a)(5) and U.S.S.G. §1B1.11(b)(1) state the Guidelines manual in

6   effect on the date of sentencing is to be used. For criminal tax cases, the tax loss is the loss that

7   would have resulted had the offense been successfully completed. §2T1.1, Application Note 1.

8   The government calculated the Base Offense Level using the tax loss proved at trial of

9   $1,397,762 and the November 1, 2012 Guidelines:

10         Base Offense Level:              22      U.S.S.G. §§2T1.1(a)(1); 2T4.1(I)

11         Special Offense Characteristics:  +2     U.S.S.G. §2T1.1(b)(2)

12         Obstruction of Justice:          +2      U.S.S.G.  §3C1.1

13         Acceptance of Responsibility:    <u>0</u>     U.S.S.G. §3E1.1

14         Total Offense Level:             26

15  With a criminal history category of I, the Guidelines range is 63 to 78 months.

16                1.     Base Offense Level

17         The base offense level is determined by referencing the Guidelines section applicable to

18  the offense of conviction, §2T1.1 (Tax Evasion). §2T1.1 uses the tax loss as defined in the tax

19  table in §2T4.1 to determine the Base Offense Level. The tax loss proved at trial for defendant's

20  individual and corporate income taxes for the years 2003 and 2004 was $1,397,762 (Government

21  Trial Exhibit 23-1, attached as Sentencing Exhibit 1). Using the November 2012 Guidelines, a

22  tax loss of more than $1,000,000 but less than $2,500,000 corresponds to a Base Offense Level

23  of 22. <u>See</u> U.S.S.G. §2T4.1(I).

24                2.     Evidence Introduced at Defendant's Two Trials

25         The first trial on the four counts charged in the indictment commenced on September 10,

26  2012. On September 19, 2012, the jury found defendant guilty of failing to file corporate tax

27  returns (Counts 3 and 4 of the Indictment) and was unable to reach a verdict on the two counts of

28

3

tax evasion (Counts 1 and 2 of the Indictment). The government's retrial of the two counts of tax evasion began on January 8, 2013. On January 11, 2013, the jury convicted defendant on both counts. As stated in its Motion in Limine filed before the second trial (Doc. No. 142), the government presented the same evidence at both trials. The following paragraphs summarize the facts proved at trial.

Since 2002, defendant operated DSI out of his home in Idaho.  DSI specialized in debt relief solution products and targeted individuals with considerable debt. The product provided the buyer a packet of information outlining ways of alleviating or eliminating debt.  Defendant hired a network of marketers throughout the United States who solicited customers through leads and phone calls. He also established call centers where clients who bought his materials could speak with persons who would assist in guiding the buyer through the process.

At each trial several marketers described the solicitation process where they would cold-call potential clients in an effort to sell them debt relief products. The witnesses testified that when a sale was made they would keep a portion of the money for themselves and forward the remaining amount to defendant in Idaho via check or fax. The marketers also testified that defendant required them to open offshore bank accounts, called "WWIN" accounts, to use for transferring money related to the sales of the debt relief products.

At trial, each marketer reviewed a series of checks they sent to defendant in 2003 and 2004 and testified they represented defendant's share of each sale. The witnesses' testimony and volume of checks illustrated how successful and profitable DSI and NAES were in 2003 and 2004. For example, Douglas Middleton testified about 13 payments he sent to defendant which totaled over $45,000. (Trial Exhibit 28-2). Similarly, Karl Bessey, one of defendant's more successful marketers, testified regarding over 30 checks he sent to defendant in October and November of 2003 which totaled over $50,000. (Trial Exhibit 41-1). Revenue Agent Sherman Burger calculated that defendant received at least $3.2 million from his marketers in 2003 and at least $3 million in 2004 (Trial Exhibits 23-7 and 23-21, attached as Sentencing Exhibits 2 and 3, respectively).

To prove defendant personally benefitted from the success of his businesses, the government called several witnesses regarding money the defendant spent in 2003 and 2004. Jason Roylance, a construction contractor, testified he received over $700,000 from the defendant for the purchase of a residence and two four-plex apartment buildings. Mark Hug, a representative from the Bellagio Casino in Las Vegas, testified that defendant had offshore wires totaling $124,980 sent to the Bellagio Casino to fund nine separate gambling trips.

During 2003 and 2004 defendant had no personal bank accounts in his name. Instead he used four corporate bank accounts: 1) a US Bank account in the name of IACSA, a Costa Rican corporation; 2) a US Bank account in the name of DSI; 3) a Wells Fargo account in the name of DSI; and 4) a Wells Fargo account for NAES. Maureen Mitchell, defendant's sister, testified she made deposits to these bank accounts but her brother was the only person with signature authority on the accounts. From those four corporate bank accounts defendant sent over $5 million to WWIN accounts located at an offshore bank in the Dominican Republic through CCW, a check clearinghouse. Trial Exhibit 23-27 summarized 40 checks defendant wrote to CCW in 2003 and 2004, totaling over $5.4 million (attached as Sentencing Exhibit 4). The wires to Roylance and the Bellagio were funded with this money.

Revenue Agent Sherman Burger testified regarding the in-depth analysis he performed on the four corporate bank accounts to determine the unreported income and taxes due for DSI, NAES and defendant. Sentencing Exhibit 1 sets forth the government's tax loss computations. The 2003 individual income tax loss is $63,959 and for 2004 is $78,712. The corporate income tax loss for DSI is $761,105 in 2003 and $368,574 in 2004. The 2004 corporate income tax loss for NAES is $125,412. The total tax loss proved at trial is $1,397,762.

3.      Specific Offense Characteristics

The Guidelines state that the sophisticated means enhancement applies with "means especially complex, or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates

sophisticated means." U.S.S.G. § 2T1.1, Commentary, Application Note 4. Defendant utilized offshore financial accounts in the Dominican Republic to conceal and disguise his ownership and control of the funds. He also titled most of his real and personal property in the names of corporate nominees. As noted above, in 2003 and 2004 he used these accounts to pay for his residence, two apartment buildings, and extensive gambling. Defendant utilized his years of business knowledge to set up the offshore accounts and to require his marketers to send his share of the proceeds from the sale of debt elimination products directly offshore knowing that offshore accounts remove money from the immediate reach and detection of the IRS. The extensive network of marketers, business offices and resources defendant employed in 2003 and 2004 clearly illustrates his business experience and the complexity with which he operated.[1] Based on the forgoing, the Specific Offense Characteristic for Use of Sophisticated Means should be applied in this case.

4.   Obstructing or Impeding the Administration of Justice

The adjustment applies if defendant's obstructive conduct "occurred with respect to the investigation, prosecution or sentencing of the defendant's instant offense of conviction . . . and related to the defendant's offense of conviction and any relevant conduct." U.S.S.G §3C1.1, Commentary, Application Note 1. During the pretrial hearing and throughout the trial, the Court repeatedly ruled that defendant was not permitted to ask witnesses legal questions on cross-examination. Moreover, defendant was cautioned many times by Judge Lodge at his first trial about asking improper questions. The government's Motion in Limine filed before the January, 2013 trial cited portions of colloquies between defendant and Judge Lodge regarding the cross-examination of twelve different witnesses during the September, 2012 trial (Doc. No. 142, pages 11-16).

---

[1] While "sophisticated means" is an appropriate enhancement given defendant's use of offshore accounts, defendant utilized his special skill as a businessman familiar with debt relief marketing and offshore financing to evade the IRS. Accordingly, the "special skill" enhancement (§3B1.3) may be appropriate in addition to the "sophisticated means" enhancement.

6

Defendant's specific actions in which he attempted to obstruct the administration of justice at the trial over which this Court presided are set forth below:

- During opening statement, defendant stated that while the prosecution argued 26 U.S.C. § 7201 contains three elements he believes there are really four elements to the crime, alluding to the fact that applicability of the codes is an element of the crime.

- During cross-examination of government witnesses, defendant asked questions about legal issues in violation of the Court's repeated admonishments those questions were improper. Defendant's strategy was evident in his closing argument: he repeatedly asked improper questions which he knew would be sustained and then used the Court's evidentiary rulings as a basis to improperly suggest to the jury that he had not received a fair trial.

- During his closing argument defendant intentionally made statements which he knew were in direct violation of the Court's instructions.
  - Defendant invited the jury to consider punishment by stating the government was "trying to put him in a cage for 14 years."
  - Defendant repeatedly encouraged the jurors to do their own research on the income tax laws, in direct violation of the Court's instructions.

- During his closing argument defendant testified to facts not in evidence, in violation of the Court's repeated admonishments and Judge Lodge's instructions that the Rules of Evidence require closing argument to be based on the evidence presented during the trial.
  - Defendant stated at length his own opinions of the tax laws.
  - Defendant said an agent came to his house and pointed a gun at him and told him he had to pay taxes.

Many of defendant's closing arguments were blatant attempts to encourage individual jurors to render a decision, or to refuse to render a decision, based on sympathy or a mutual disagreement with the tax laws. Defendant displayed a wanton disregard for the Court's orders and attempted to subjugate the Court's authority despite continuous warnings from the Court.

7

Application Note 3 to §3C1.1 states that "obstructive conduct can vary widely in nature, degree of planning, and seriousness." Application Note 4 provides a non-exhaustive list of examples of the types of conduct to which the obstruction adjustment is intended to apply. Example A includes unlawfully influencing a juror, directly or indirectly, or attempting to do so. Even though this Court and Judge Lodge gave defendant significant latitude since he was representing himself, defendant intentionally violated the Court's orders in an effort to unlawfully influence the jury. Therefore the two-point obstruction of justice enhancement is appropriate.[2]

B.     Imposition of a Term of Imprisonment

A sentence of 78 months, the high end of the Guidelines range as estimated by the government, is warranted in this case. Defendant is an intelligent person. In running a business that grossed millions of dollars in sales he displayed his business acumen. He established a successful organization that employed a network of marketers across the United States, Canada and Mexico. Defendant also displayed his knowledge in financial matters by setting up offshore accounts and funneling his money to these accounts to avoid detection by the IRS. Defendant was deliberate and calculating in his defiance of the tax laws. At the same time, he lived a very comfortable lifestyle. In addition to the money spent purchasing his home and two apartment buildings and gambling, defendant built a schoolhouse in his backyard for his children, purchased luxury vehicles, a Harley Davidson motorcycle, and spent thousands of dollars on cosmetic dentistry. The fact he paid $0 in taxes on the millions of dollars he earned allowed him to live such a lavish lifestyle.

---

[2] Following defendant's convictions on tax evasion the Court held a hearing to discuss whether defendant should be remanded. At the end of this discussion the government raised the prospect of holding defendant in criminal contempt for his intentional violations of the Court's orders as permitted under 18 U.S.C. Section 401, Federal Rule of Criminal Procedure 42(b) and 28 U.S.C. Section 636(e). As an alternative the government is arguing for the obstruction adjustment to emphasize that defendant should be sentenced to some additional term of incarceration for his contemptuous and obstructive conduct.

Additionally, defendant has shown no remorse for his crimes nor any respect for the judicial process. Throughout both trials defendant repeatedly violated court orders by asking questions that he knew were improper. Since he was remanded into custody following his tax evasion convictions, he has filed numerous frivolous motions with the Court. Defendant remains adamant in his obstinance.  Specific deterrence in this case requires a severe sentence.

General deterrence also warrants a 78-month sentence. A sentence at the high end of the Guidelines range will send a message to other successful businessmen that it is their legal duty to pay income taxes. A lengthy term of custody will be a compelling message that individuals who use foreign bank accounts to conceal their income from the IRS will face prison.

Finally, defendant subscribes to the notion that the federal government does not have the authority to tax its citizens and that federal income tax is illegal. In fact, he sold abusive tax schemes as a marketer for Global Prosperity in the 1990s. In his interview with the probation officer he admitted working for that entity but euphemistically described its product as "financial education." PSR ¶51. Defendant's involvement with Global allowed him to be successful in his own business because he used many of the marketers he met through Global to sell his debt elimination products.

A 78-month sentence will send a strong deterrent message to other promoters of these fraudulent theories. Finally, a severe sentence will warn other individuals who may be tempted to drop out of the tax system that they do so at their peril.

C.    Supervised Release

Pursuant to 18 U.S.C. § 3583(b), the Court may impose a term of supervised release of no more than three years for the felony convictions and no more than one year for the misdemeanor convictions. The government recommends the maximum term of supervised release of three years. The government also requests the Court order defendant to make monthly payments of no less than $100 in restitution to the IRS as a condition of supervised release.

1       D.    <u>Restitution</u>[3]

2       The Court has the authority to order restitution as a special condition of supervised

3 release. When there is an identifiable victim, the Guidelines state the court shall "impose a term

4 of probation or supervised release with a condition requiring restitution for the full amount of the

5 victim's loss, if the offense is not an offense for which restitution is authorized under 18 U.S.C. §

6 3663(a)(1) but otherwise meets the criteria for an order of restitution under that section."

7 U.S.S.G. §5E1.1(a)(2). Generally, the amount of restitution is limited to losses caused by the

8 specific conduct underlying the offense of conviction. A recent Ninth Circuit case involving

9 criminal tax charges, <u>United States v. Baston</u>, 608 F.3d 630 (9th Cir. 2010), held that Title 18

10 U.S.C. §3583(d) grants federal courts broad discretion to order restitution as a condition of

11 supervised release for any criminal offense. Defendant should be ordered to make restitution to

12 the IRS for $1,397,762, the 2003 and 2004 individual and corporate income tax loss proved at

13 trial.

14       Pursuant to <u>Ward v. Chavez</u>, 678 F.3d 1042, 1046-51 (9th Cir. 2012), the Court should

15 set a restitution payment schedule. To make that determination the district court should consider

16 the financial resources of the defendant and whether nominal periodic payments are appropriate.

17 See 18 U.S.C. §3664(f)(2)(A) and §3664(f)(3)(B). The government recommends a nominal

18 payment of $100 be imposed now since it is uncertain what defendant's financial resources will

19 be after he is released from custody. When defendant begins his period of supervised release the

20 Probation Office can gather financial information and provide it to the government and the Court

21 to evaluate whether the monthly restitution payment should be changed.

22       It is also important to note that the law allows the government to continue collection of

23 the restitution after the period of supervised release expires. Under 18 U.S.C. §3664(m)(1)(A),

24 "[a]n order of restitution may be enforced by the United States in the manner provided for in

25 subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or by all other available

26

27      [3] PSR ¶82 cites 18 § 3663A as a basis to order restitution in this case. However, restitution is not mandatory in Title 26 cases.

28

1   and reasonable means." <u>United States v. Young</u>, 593 F.3d 773,774 (8th Cir. 2010) (garnishment

2   after term of supervised release was appropriate because the obligation to pay restitution did not

3   terminate when supervised release ended).

4         To assist the clerk of courts in processing restitution payments, the government requests

5   the Court include the IRS's centralized location for collection of restitution payments in the

6   judgment:

7         IRS - RACS
          Mail Stop 6261, Restitution
8         333 W. Pershing Ave
          Kansas City, MO 64108

9

10        E.    <u>Fine</u>

11        As set forth in the PSR ¶¶78-80, the maximum fine for count one and two is $250,000

12  and $100,000 for count 3 and 4. 18 U.S.C. §3571(b). A special assessment of $100 is mandatory

13  for each felony count and $25 for each misdemeanor convictions, for a total of $250. Pursuant to

14  §5E1.2(c)(3), the PSR calculated the fine range as $10,000 to $100,000 based on a Total Offense

15  Level of 24. The fine range for a Total Offense Level of 26 as calculated by the government is

16  $12,500 to $125,000. If restitution is ordered by the Court the government recommends no fine.

17  If restitution is not ordered by the Court, the government recommends a $125,000 fine.

18  **III.   SENTENCING FACTORS**

19        First, the Court is to consider the nature and circumstances of the offense and the history

20  and characteristics of the defendant. 18 U.S.C. §3553(a)(1). Next, Title 18 U.S.C. §3553(a)(2)

21  asks the Court to consider the need for the sentence imposed to reflect the seriousness of the

22  offense, to promote respect for the law, and to provide just punishment for the offense, as well as

23  to afford adequate deterrence, both specific and general. Because of the nature of tax crimes,

24  general deterrence is an especially important factor. The Sentencing Guidelines note:

25        The criminal tax laws are designed to protect the public interest in preserving the
          integrity of the nation's tax system.  Criminal tax prosecutions serve to punish the
26        violator and promote respect for the tax laws. ***Because of the limited number of***
          ***criminal tax prosecutions relative to the estimated incidence of such violations,***
27        ***deterring others from violating the tax laws is a primary consideration***.

28

U.S.S.G. Ch. 2, Part T, intro. comment (emphasis added). Here, the Court should impose a sentence of 78 months in order to ensure that others who commit tax fraud know there is a price to be paid to society, and that price is the loss of freedom for a sustained period of time. A lengthy term of imprisonment is necessary to properly reflect the seriousness of defendant's conduct, to provide just punishment, and to promote respect for the law.

Title 18 U.S.C. §3553(a)(4) and (5) instruct the district court to consider the Guidelines sentence and applicable policy statements. Defendant's willful tax evasion is precisely the sort of conduct to which the Guidelines are addressed, and a Guidelines sentence is appropriate. The government's recommendation of a sentence pursuant to the Guidelines is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing. "In accord with 18 U.S.C. §3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough v. United States, 128 S.Ct. 558, 564 (2007). It remains the case, however, that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" Id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007)(McConnell, J., concurring)). The Kimbrough Court further stated, "[w]e have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Id. (quoting Rita v. United States, 127 S.Ct. 2456, 2465 (2007)).

Moreover, the advisory Guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. This concept is widely recognized in other circuits. As the Third Circuit explained:

Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the Guidelines." The section of <u>Booker</u> that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." <u>Booker</u>, 543 U.S. at 264-65. The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the <u>Booker</u> Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. <u>Id.</u> at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" <u>Cooper</u>, 437 F.3d at 331 (quoting <u>United States v. Mykytiuk</u>, 415 F.3d 606, 608 (7th Cir. 2005)).

The Ninth Circuit in <u>United States v. Carty</u>, 520 F.3d 984 (9th Cir. 2008), set forth the "framework" for a defendant's sentencing:

The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. <u>Id.</u> at 991 citing 18 U.S.C. § 3553(a) and (a)(2).

The Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." <u>Gall v. United States</u>, 128 S.Ct. 586, 597 n. 6 (2007). For all of these reasons, the advisory Guidelines range helps to assure fair, proportionate, and uniform sentencing of criminal offenders.

## IV.   <u>CONCLUSION</u>

Defendant accepted all of the benefits of living in the United States and made millions of dollars operating very successful businesses. A severe sentence will send the message that individuals may not discard the responsibilities of citizenship.

Date: April 15, 2013                    Respectfully Submitted,

                                        KATHRYN KENEALLY
                                        Assistant Attorney General


                                         s/Lori A. Hendrickson
                                        LORI A. HENDRICKSON
                                        CHRISTOPHER P. O'DONNELL
                                        Trial Attorneys
                                        Department of Justice, Tax Division

## SENTENCING EXHIBITS

1.      Summary of 2003 and 2004 individual and corporate income tax loss (Trial Exhibit 23-1)

2.      Summary of 40 checks payable to CCW sent offshore totaling over $5.4 million (Trial Exhibit 23-27)

3.      Summary of money received from marketers deposited to US bank accounts in 2003 (Trial Exhibit 23-7)

4.      Summary of money received from marketers deposited to US bank accounts in 2004 (Trial Exhibit 23-21)